# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

JOHN SMALLWOOD,

    Plaintiff,

           v.

T&A FARMS, TIMOTHY DALE DAVIS,
ALPHINE DAVIS, and STACEY
DINWIDDIE,

    Defendants.

No. 5:14-CV-87

## ORDER

Before the Court in this race discrimination case is Defendants T&A Farms, Timothy Dale Davis ("Dale"), Alphine ("Alphine") Davis, and Stacey Dinwiddie's ("Dinwiddie") Motion for Summary Judgment, dkt. no. 65. The motion is fully briefed and ripe for disposition. Dkt. Nos. 71-72, 79. For the reasons below, it will be **DENIED**. Plaintiff John Smallwood ("Smallwood") claims that Defendants ran a racist workplace, cut his hours after he complained to EEOC, and ultimately terminated him in retaliation. See generally Dkt. No. 71. Smallwood has raised genuine issues of material fact, and therefore, the jury must decide this matter.

## Factual Background[1]

### Smallwood Worked for and with Defendants

The Court views the evidence most favorably to the nonmovant, Smallwood, as it must in deciding summary judgment. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000). It ignores as immaterial any inconsistencies in his case. Tomlin v. JCS Enters., Inc., 13 F. Supp. 3d 1330, 1332 n.1 (N.D. Ga. 2014).

Smallwood worked for T&A Farms from sometime in 2010 to November 2014. Dkt. No. 72 ¶¶ 41, 50. T&A Farms is a family egg farm. Id. ¶¶ 1-2, 13. Hens there lay eggs in nests, and the eggs roll onto a conveyer belt, whence they are collected. Id. ¶ 2. Two sorts of employees help with this process: walkers and belt runners. Walkers train chickens to lay their

---

[1] Two declarations that Smallwood submitted do not comply with 28 U.S.C. § 1746. Declaration of Tim O'Hara, dkt. no. 71-22, lacks a date and perjury statement. Declaration of Lawrence Revis Jr., dkt. no. 71-10, lacks the specific day that it was signed. These flaws could justify disregarding the declarations. See, e.g., Orr v. Orbis Corp. (Wisc.), No. 1:07-CV-2653, 2010 WL 3368324, at *3 (N.D. Ga. July 30, 2010), adopted, 2010 WL 3368119 (N.D. Ga. Aug. 23, 2010). However, the Court declines to do so for four reasons. Defendants did not object. See Hepp v. Paul Revere Life Ins. Co., No. 8:13-CV-2836, 2015 WL 4072101, at *2 (M.D. Fla. July 2, 2015) ("Given that . . . there is no dispute regarding the authenticity of the declarations, and no showing of prejudice to Defendants, the Court finds no reason to strike . . . ."). The declarations' content "could be 'reduced to admissible evidence at trial,'" by having the declarants testify. Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999); see also Calhoun v. McHugh, 2 F. Supp. 3d 1217, 1226 (N.D. Ala. 2014). Extrinsic evidence could confirm the declarations' dates: O'Hara's refers to "last Thursday" and "again on Saturday," dkt. no. 71-22 ¶ 5, while Revis's specifies that it was signed in October 2016. Dkt. No. 71-10 at 6. See Proch v. DeRoche, No. 3:08-CV-484, 2011 WL 6841319, at *3 n.8 (N.D. Fla. Dec. 20, 2011) ("[E]xtrinsic evidence could demonstrate the period when the declaration was signed . . . ."). Besides, the declarations are not determinative of the present motion's outcome anyway.

AO 72A
(Rev. 8/82)

eggs inside the nests. Id. Belt runners take eggs from the belts. Id. Each of T&A Farms' three chicken houses needed one belt runner, plus either its own walker or a shared one, during peak season. Id. ¶¶ 3-4. The farm also hired relief workers. Id. ¶ 5. Employees were at-will, without written contracts. Id. ¶ 14.

Peak egg season would come six to eight weeks after chickens arrived and last for another six to eight. Id. ¶ 8. The parties disagree as to what happened outside of peak season, with Defendants claiming business slowed down, but Smallwood alleging that the seven-day workweek would drop to five days but otherwise remain the same—until he filed his EEOC charge. Id. ¶ 46.

Smallwood was first hired as a walker, paid $40 daily (he later took on some backup mechanic work, and his pay rose to $45). Dkt. No. 71 at 2; Dkt. No. 71-1 ¶¶ 3, 41, 43-44. The parties disagree as to whether Smallwood was ever seasonally laid off before filing his EEOC charge. Dkt. No. 71-1 ¶ 41.

Dale owns T&A Farms; the parties disagree as to whether Alphine is a co-owner. Dkt. No. 72 ¶ 15. Alphine is his wife, and Dinwiddie their daughter. Id. ¶¶ 16-17, 22.

Alphine worked at the farm two to three times weekly. Id. ¶ 24. She would assign some tasks. Dkt. No. 71-2 at 87:8-16. Employees would report issues to her in Dale's

absence. Id. at 87:19-23. Dale and Alphine claim that Alphine had "no managerial or supervisory responsibility." Dkt. No. 72 ¶ 21.

Dinwiddie "regularly worked" at the farm. Id. ¶ 27. Alphine allegedly once told Smallwood's wife, Sheila Smallwood ("Sheila"), "[Dinwiddie] is over this farm now. . . . [W]hatever [Dinwiddie] say [sic], you do it." Dkt. No. 71-4 at 43:12-15; see also Dkt. No. 71-5 at 49:16-19 (deposition of Lawrence Revis, Jr.) ("[Alphine] . . . told us '[Dinwiddie] is going to be the manager. I'm going to be out for a couple of days. . . . You all need to do what she says.'"). Dinwiddie gave workers days off and assigned tasks, but Smallwood did not believe that he had to follow her orders, and did not deem her his direct manager. Id. at 54:25-55:18; Dkt. No. 71-2 at 85:8-86:6, 105:5-7; but see Dkt. No. 71-5 at 49:22-50:8 (describing Dinwiddie as direct manager in Dale's absence).

Her husband, Michael Dinwiddie ("Michael"), worked at the farm too, often doing maintenance. Dkt. No. 72 ¶ 26.

**Smallwood Alleges that Defendants Maintained Racist Work Conditions**

Smallwood alleges that T&A Farms was a hotbed of racism, with racist working conditions and Defendants constantly using invidious racial epithets.

AO 72A
(Rev. 8/82)

Black employees allegedly had to clean white employees' eggs for them. Dkt. No. 71-2 at 49:2-3.

Defendants supposedly paid white employees more than black ones. Sheila claims to have once found a payroll paper indicating that white employees earned $55 to $60 a day. Dkt. No. 72 ¶ 32; cf. Dkt. No. 71-8 ¶ 6. Her coworker testified that he also saw the paper; he said that it listed the wages of all white employees, including two who were unrelated to Dale, as $55 daily. Dkt. No. 71-5 at 25:18-27:11 (statement of Lawrence Revis, Jr.). That employee confronted Dale, who allegedly told him, "If you don't like the way I run this, you can leave." Id. at 32:4-7. Defendants say that all employees other than Michael were paid $40 daily, and that Michael only made $42.85 a day. Dkt. No. 65-3 ¶¶ 11, 25.

Smallwood claims that eating lunch in Defendants' office was a right reserved to whites. Dkt. No. 71-1 ¶¶ 41-42. So was taking free water from, or using, a refrigerator. Dkt. No. 71-4 at 88:6-90:7; Dkt. No. 71-5 at 47:17-19.

Black employees could allegedly only sit on milk crates, while white ones could use chairs. Dkt. No. 71-4 at 58:4-6. Smallwood claims that Defendants cut black employees' hours, pointing to financial concerns, but brought on paid white relief workers to take the shifts. Id. at 86:8-25; Dkt. No. 71-2 at 82:4-83:16; Dkt. No. 71-5 at 38:5-40:15.

AO 72A
(Rev. 8/82)

Smallwood presented evidence that black employees, and they alone, could not use the only chicken-house bathroom or another farm bathroom, but rather, were directed to the woods. Dkt. No. 72 ¶¶ 35, 40. Defendants deny this. Id.

**Smallwood Alleges that Defendants Used Racial Epithets**

Defendants allegedly infused racism into their language. Dale purportedly used many slurs:

> The "N" word came out maybe once every few weeks. "Yard monkey" was him referring to [Sheila's] grandbaby by one of the other black employees. . . . "I'll slap the black off [of you]" [ ] was if we wasn't doing our work properly. . . . The "coon" word was used at least once, if not twice a week. . . .

Dkt. No. 71-4 at 40:13-41:7; see also id. at 41:10-16; Dkt. No. 71-2 at 83:13-84:10; Dkt. No. 71-22 ¶ 4 (declaration of Tim O'Hara) ("[Dale] admitted to me that he called us the 'N' word, yardmonkeys and coons."); Dkt. No. 71-3 ¶ 12 (declaration of John Smallwood) (describing Dale making black-power salute and saying, "Ain't that what y'all niggers do back in the day!"); Dkt. No. 71-10 ¶ 7 (declaration of Lawrence Revis, Jr.) (describing Dale calling black workers "coons" and "yard monkeys"); cf. Dkt. No. 71-5 at 32:17 (deposition of Lawrence Revis, Jr.) ("He called me 'boy'.").[2]

---

[2] Smallwood also filed a recording, allegedly of a conversation between Dale and him. Dkt. No. 71-20 at 2; see also Dkt. No. 71-2 at 93:6-94:25 (describing conversation and asserting recording's authenticity). It is difficult to make out what is said, and Defendants did not concede its veracity. Dkt. No. 71-2 at 95:24-96:8. However, the supposed Dale does

AO 72A
(Rev. 8/82)

Dale reportedly once asked a white employee about Smallwood's whereabouts by saying, "I wonder where the coon is?" Dkt. No. 71-2 at 84:3-5.

Sheila recalls protesting Dale's use of "nigger." "[She] went to him three or four times . . . ." Dkt. No. 71-4 at 42:4-6. She testified that Dale responded that when he was young, his father "slapped [him] in his mouth" for using a black man's name, telling him, "Those are niggers. That's what you call them." Id. at 42:10-17. Dale supposedly told her, "Just take what we say and move on." Id. at 42:20-21; cf. Dkt. No. 71-5 at 34:12-14 (deposition of Lawrence Revis, Jr.) (saying when confronted about calling black men "boys," Dale "laughed it off").

After President Obama's reelection, Sheila says that Dale asked her and Smallwood, "Why did you all get that coon back into office?" Id. at 85:20-22.

Dale denies ever using any of these racial slurs against black employees. Dkt. No. 72 ¶ 70; see also Dkt. No. 65-3 ¶ 51 (claiming that he uses "boy," without racial overtones, to refer to males, including friends and family members).[3]

---

clearly ask the supposed John, "[H]ave you ever been called a coon before?" John says that he has, and Dale replies, "You probably have. I'll admit it to you, I ain't going to admit it to nobody else." Dkt. No. 71, Ex. 19 at 0:25-33.

[3] Practically identical paragraphs appear in Alphine's and Dinwiddie's declarations. Dkt. No. 65-4 ¶¶ 27, 32; Dkt. No. 65-5 ¶¶ 16, 21.

AO 72A
(Rev. 8/82)

Dale was purportedly not the only Defendant to speak in a racist way. Alphine supposedly said that Sheila's grandson's father "look[ed] like a yard monkey," and asked if she was "afraid that [her] grandson would come out looking like a yard monkey and be as black as [the father]." Dkt. No. 71-4 at 72:8-13. When Sheila protested, Alphine allegedly replied, "This is my property, and I can say and do what I want to." Id. at 74:8-9. Alphine denies using any of the racial slurs alleged against employees. Dkt. No. 65-4 ¶ 27.

Dinwiddie allegedly referred to black employees, but not white men, as "boys." Dkt. No. 71-4 at 78:17-79:8, 103:6-11; see also Dkt. No. 71-5 at 51:23-52:3. One day, Sheila's mixed-race adopted son came to visit the farm. Id. at 80:9-13. Dinwiddie supposedly asked, "How can you all have a mixed baby?" Id. at 80:13-16. Dinwiddie allegedly said that she was trying to become a foster parent, but had rejected a black child. Id. at 80:18-20. "I couldn't tell them I was racist, or I was a bitch," she reportedly said, but "[a] coon or a nigger baby would never be welcome around our table." Id. at 81:10-11, 20-21; cf. Dkt. No. 71-5 at 51:5-18 (testifying Dinwiddie called black people "coon," "the 'N' word," and "boy"). When Sheila replied that her son would be taught to see love and not skin color, Dinwiddie allegedly answered, "[I]t's not like that in our house." Id. at 81:20-25.

AO 72A
(Rev. 8/82)

Then, several other black employees walked in. Sheila says that Dinwiddie looked around and said, "You all make me feel threatened, like you all want to jump on me." Id. at 82:7-15. "Ain't that what you all black people do, you all gang up and jump on people?" she allegedly asked. Id. at 82:20-22. According to Sheila, Dinwiddie also once compared a group of black people to a cow herd. Id. at 83:19-22. Dale had supposedly said something similar to Sheila's son. Id. at 83:22-23; cf. Dkt. No. 71-2 at 98:15-17 (saying Dale admitted to comparing black people to "a bunch of cows trying to jump on you.").

Finally, Dinwiddie allegedly told black employees listening to rap that Dale "don't like you playing that nigger music out here." Id. at 84:16-18; cf. Dkt. No. 71-3 ¶ 9.

Dinwiddie denies using the racial slurs alleged against black employees. Dkt. No. 72 ¶ 70.

**Defendants Allegedly Terminated Sheila after Calling Her an Epithet**

Tensions peaked one November 2013 day. Alphine ordered Smallwood to fix a water hose, throwing it at his feet. Dkt. No. 71-4 at 18:19-22; Dkt. No. 71-2 at 34:25-35:2. Smallwood had already fixed Sheila's hose, but Alphine had given it to Michael. Dkt. No. 71-4 at 18:18-19, 18:23-19:3; see also Dkt. No. 71-2 at 34:21-24. Sheila protested Smallwood having to

AO 72A
(Rev. 8/82)

fix another hose. <u>Id.</u> In the ensuing argument, Alphine supposedly said, "You think you got too much education because you're in school. You're an uppity nigger." <u>Id.</u> at 19:9-11; <u>see also</u> Dkt. No. 71-2 at 37:20-38:3. Sheila and Alphine argued, and Dale, nearby, allegedly told Smallwood, "Take [Sheila's] ass home. . . . Get her off of my property." <u>Id.</u> at 19:12-20:8; <u>cf.</u> Dkt. No. 71-2 at 39:11-42:7.

Defendants recall the day differently, claiming that Sheila was upset for non-racism reasons. Dkt. No. 65-3 ¶¶ 35-36; <u>but see</u> Dkt. No. 71-8 ¶ 13. She argued with Alphine and Michael about the hose. <u>Id.</u> ¶ 37. Alphine did not use a racial slur. <u>Id.</u> ¶ 38; <u>see also</u> Dkt. No. 65-4 ¶ 21. Dale did not like Sheila's tone, and asked Smallwood to take her home because she was out of control. <u>Id.</u> ¶ 38.

**Smallwood Files an EEOC Discrimination Charge and Dale Purportedly Harasses Him**

A few weeks later, on December 18, 2013, Smallwood filed an EEOC race, retaliation, and hostile workplace charge. Dkt. No. 71-2 at 32.[4] Dale allegedly threatened to fire him upon receiving EEOC papers, then on other occasions. <u>Id.</u> at 44:22-23, 76:7-77:22. Dale confronted Smallwood with the papers and asked, "See what you have done?" <u>Id.</u> at 90:25-91:10.

---

[4] This citation is to p. 32 of the file, which is the actual EEOC charge, not of the deposition transcript.

AO 72A
(Rev. 8/82)

Smallwood contends that the next year was a long series of inappropriate behavior. Dale allegedly continued to call Smallwood "coon" and "boy." Id. at 46:9-17, 60:23-61:12. For the first time, Smallwood says, Dale began to complain about Smallwood's performance. Id. at 78:12-24.

Dale supposedly pressured him to drop the charge. Id. at 52:3-7. Because Smallwood would not do so, and had filed the charge in the first place, Dale supposedly cut the number of days that he could work—including immediately suspending him without pay for a week—without compensating him. Id. at 74:14-75:2, 79:17-80:24, 82:4-18. His hours were purportedly given to a white relief worker. Id. at 82:19-83:11.

Smallwood submitted several recordings. On them, the voice that Smallwood alleges to be Dale's says:

- "Why you doin' yours? If you want your job, you're goin' to do what I [unintelligible]. . . . [G]et your ass up here and get back to work. . . . [T]hat's the smartest thing to do. . . . a couple of niggers. . . . I don't get why you doin' this, if you want your job. Explain that to me." A female voice twice refers to "niggers." Dkt. No. 71, Ex. 10.

- "I'm a son of a bitch . . . I don't fuck with you . . . Goddamn if you [unintelligible] those papers. . . . When you've done those papers, you done fucked with me, [Smallwood]. . . ." Id., Ex. 11.

11

- "[I]f it's going to cost me, it's going to cost you. . . . [Sheila is] costing the fuck out of me [with her discrimination claim], I know that. If she's goin' make it hard it on me, I'm goin' to make it hard on you." Id., Ex. 15 at 0:31-34, 4:06-13.

- "I was asked by my lawyer not to show you this, but . . . I'm going to be honest with you . . . [W]hen you get down to wherever it's going, you can change your mind, and say you signed this . . . But . . . I'll find out pretty quick." Id., Ex. 16.

- "I ain't said nothin' . . . [H]ave you ever been called a 'coon' before? . . . You probably have. I'll admit it to you, I ain't goin' to admit it to nobody else . . . I will tell you that." Id., Ex. 19 at 0:23-36.

Dale supposedly offered Smallwood money to say that he lied about signing his EEOC charge, and to take Defendants' side against Sheila's. Dkt. No. 71-2 at 81:5-14. Smallwood filed an internal grievance in August 2014, then complained to Dale again in October 2014. Dkt. No. 71-3 ¶ 11.

**Smallwood Was Terminated and Filed this Suit**

On August 4, 2014, Smallwood received his EEOC notice of right to sue. Dkt. No. 1-1. He filed this suit on October 28, 2014. Dkt. No. 1. He ultimately alleged four counts: (1) discrimination; (2) disparate treatment; (3) retaliation; and

AO 72A
(Rev. 8/82)

(4) hostile work environment. Dkt. No. 6 ¶¶ 60-92. He was terminated in November 2014. Dkt. No. 71-3 ¶ 11.

A current employee claims that Dale "has paid [the employee] extra money and offered to buy [him] a car if [he] agree[s] to testify on [Dale's] behalf and say what [Dale] want[s] [him] to say." Dkt. No. 71-22 ¶ 5. He says that Dale "has been . . . asking the black employees to take up for [Dale] in court." Id. ¶ 6.

Dale says that Smallwood decided to make "highly inflammatory, false" allegations against him and his family after Sheila visited the EEOC's website. Dkt. No. 65-3 ¶ 48. He believes that Sheila, "with her strong personality, persuaded her husband and fellow African American co-workers to join with her in a conspiracy to sue [him] and [his] family for money in a bogus discrimination case." Id. ¶ 49.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is

AO 72A
(Rev. 8/82)

"genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The court must view the evidence most favorably to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The movant must establish that there is no genuine issue of material fact by showing that the nonmovant's case lacks supporting evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). If it does, then the nonmovant can show "that the record in fact contains [such] evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the [movant], who has thus failed to meet [its] initial burden." Anderson, 477 U.S. at 257; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex, 477 U.S. at 332 (Brennan, J., dissenting)). Or, the nonmovant can present "additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117.

"The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis." Foy v.

AO 72A
(Rev. 8/82)

Pat Donalson Agency, 946 F. Supp. 2d 1250, 1266 (N.D. Ala. 2013) (citing Feliciano v. City of Miami Beach, 707 F.3d 1244, 1253 (11th Cir. 2013)).

## DISCUSSION

Smallwood's claims survive summary judgment.[5]

## I. SMALLWOOD'S DISCRIMINATION CLAIMS SURVIVE.

Smallwood alleges discrimination, disparate treatment, and hostile workplace in violation of Title VII and Section 1981.[6] Dkt. No. 6 ¶¶ 60-85. Both statutes use "the same

---

[5] Mostly. Smallwood surrenders his Title VII claims against Alphine and Dinwiddie, because non-employers are not liable under Title VII. Dkt. No. 71 at 6 n.3; see also Dearth v. Collins, 441 F.3d 931, 933 (11th Cir. 2006). Defendants' motion is **GRANTED** as to these claims.

But fact issues remain as to whether Alphine and Dinwiddie can be held liable under Section 1981, which extends liability to "[s]upervisors with the capacity to hire and fire or those who can recommend such decisions." Leige v. Capitol Chevrolet, Inc., 895 F. Supp. 289, 293 (M.D. Ala. 1995); see also Powell v. Am. Remediation & Envtl., Inc., 618 F. App'x 974, 977 n.4 (11th Cir. 2015) (per curiam) (unpublished opinion). The parties disagree as to the amount of power that Alphine and Dinwiddie had in managing the small family farm. Taking the evidence in the light most favorable to Smallwood, Alphine was Dale's "silent partner" in the farm, its co-owner, an assigner of tasks who told employees whose supervision they were under, and a recipient of employee complaints. Dkt. No. 72 ¶ 15; Dkt. No. 71-2 at 87:8-2; Dkt. No. 71-5 at 49:16-19. This evidence, plus Alphine's central role in Sheila's termination, Dkt. No. 71-4 at 19:9-20:8; Dkt. No. 71-2 at 37:20-42:7, is enough to create a genuine issue of material fact as to whether she could recommend hires and firings. Dinwiddie may well have had this power—allegedly, she was to be obeyed by employees, could control their schedules, assigned their tasks, and was considered by one employee to be the direct manager when Dale was not around. Dkt. No. 71-4 at 43:12-15, 54:25-55:18; Dkt. No. 71-5 at 49:16-50:8; Dkt. No. 71-2 at 85:8-86:6, 105:5-7; see also Marshall v. Daleville City Bd. of Educ., No. 1:05CV386, 2006 WL 2056581, at *11 (M.D. Ala. July 24, 2006) ("[The defendant] was the supervisor who determined what duties would be performed by the [plaintiff], so he can be held individually liable . . . ." (footnote omitted)). A reasonable juror could determine that Alphine and Dinwiddie had enough power to be held liable under Section 1981.

[6] Defendants contend that Smallwood lacks standing for his Section 1981 claim, as he was an at-will employee without a contract. Dkt. No. 70-2 at 23-25. The Court follows every circuit court—and every Eleventh Circuit district court—to decide the question in holding that an at-will employee

AO 72A
(Rev. 8/82)

standards of proof and . . . analytical framework." <u>Bryant v.</u>

<u>Jones</u>, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009). Title VII

only applies to employers with at least fifteen employees. 42

U.S.C. § 2000e(b). There is a genuine issue of fact as to

whether this requirement is satisfied here. Questions of fact

also remain as to the merits of Smallwood's case. The Court

must therefore deny summary judgment.

### A. An Issue of Fact Remains as to the Number of T&A Farms Employees.

Defendants first argue that T&A Farms does not have

fifteen employees, and so is exempt from Title VII. Dkt. No.

65-2 at 3-4. A fact issue remains. Title VII only applies to

those employers who have "fifteen or more employees for each

working day in each of twenty or more calendar weeks in the

current or preceding calendar year." 42 U.S.C. § 2000e(b).

---

can assert a Section 1981 racial discrimination claim, at least where
state law deems at-will employment contractual (as in Georgia). <u>See</u>, <u>e.g.</u>,
<u>Aquino v. Honda of Am., Inc.</u>, 158 F. App'x 667, 673 n.3 (6th Cir. 2005);
<u>Walker v. Abbott Labs.</u>, 340 F.3d 471, 472 (7th Cir. 2003); <u>Turner v. Ark.</u>
<u>Ins. Dep't</u>, 297 F.3d 751, 756, 759 (8th Cir. 2002) (holding law clearly
established); <u>Lauture v. Int'l Bus. Machs. Corp.</u>, 216 F.3d 258, 263 (2d
Cir. 2000); <u>Perry v. Woodward</u>, 199 F.3d 1126, 1133 (10th Cir. 1999);
<u>Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.</u>, 160 F.3d 1048, 1050-
52 (5th Cir. 1998); <u>Forehand v. Fulton County</u>, 510 F. Supp. 2d 1238, 1252
(N.D. Ga. 2007); <u>Ultimax Transp., Inc. v. British Airways, Inc.</u>, 231 F.
Supp. 2d 1329, 1339 (N.D. Ga. 2002) (Carnes, J.); <u>Farrior v. H.J. Russell</u>
<u>& Co.</u>, 45 F. Supp. 2d 1358, 1366 (N.D. Ga. 1999). Recognizing such
relationships as covered by Section 1981 is especially important given
that that law exists to protect minority employees—many of whom are
employed at-will. <u>Farrior</u>, 45 F. Supp. 2d at 1365-66.

As for the supposed lack of a contract, "on-going exchange of labor
and pay"—like that between Smallwood and Defendants—"represents [an
unwritten] contract" for purposes of Section 1981. <u>Farrior</u>, 45 F. Supp.
2d at 1365 (citing Georgia law); <u>see</u> <u>also</u> <u>Spriggs v. Diamond Auto Glass</u>,
165 F.3d 1015, 1018 (4th Cir. 1999); <u>Lane v. Ogden Ent., Inc.</u>, 13 F. Supp.
2d 1261, 1272 (M.D. Ala. 1998) ("'Contract' is used in § 1981 in its basic
legal meaning . . . ."). Defendants' argument is thus meritless.

AO 72A
(Rev. 8/82)

Employees are all those in ongoing employment relationships—not just those working on any given day. Walters v. Metro. Educ. Enters., Inc., 519 U.S. 202, 206-08 (1997).

Defendants argue that they do not have fifteen employees. Dale testifies that he does not have more than six full-time employees "at any given time." Dkt. No. 65-3 ¶ 3; see also id. ¶ 8. He also avers that he usually does not hire relief workers for "more than a few days at a time." Id. ¶ 4.

However, Smallwood has evidence indicating that there may have been at least fifteen employees. Sheila testified that there were fifteen or sixteen. Dkt. No. 71-4 at 35:10-20; see also Dkt. No. 71-8 ¶ 4 (naming 30 T&A Farms employees in 2013). Smallwood counted ten to fifteen, some of them relief workers. Dkt. No. 71-2 at 33:20-34:11. A third employee testified that there would be up to fifteen, eight to thirteen of whom would be present on any given day. Dkt. No. 71-5 at 22:4-23:25. Some documentation supports these estimates: Timothy and Alphine cut checks to 25 people between late December 2012 and the start of 2014. Dkt. No. 71-9 at 7-55; see also Dkt. No. 71-15 at 2-5. Smallwood's evidence defeats summary judgment based on the number of T&A Farms employees.

**B. Issues Remain as to the Merits of Smallwood's Case.**

AO 72A
(Rev. 8/82)

Smallwood has also presented enough evidence of discrimination and disparate treatment,[7] and hostile workplace, to prevent summary judgment.

   i.  **Issues remain as to the discrimination and disparate treatment claims.**

Genuine factual issues remain as to Smallwood's discrimination and disparate treatment claims. An employer can be liable if one of its employment decisions is based on discriminatory intent. Holland v. Gee, 677 F.3d 1047, 1055 (11th Cir. 2012). Plaintiffs can establish such intent via direct, circumstantial, or statistical evidence. Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989). Smallwood's case survives based on circumstantial evidence. Smallwood must win the three-set tennis match prescribed by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973): (1) he must make out a prima facie case of discrimination; (2) then, Defendants can "articulate some legitimate, nondiscriminatory reason" for their actions; (3) lastly, Smallwood must then show that whatever reason Defendants give is mere pretext. He makes it through this gauntlet.

---

[7] The parties do not distinguish between these two claims, and so the Court will not, either. See generally Dkt. Nos. 65-2, 71, 79; Resolution Tr. Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) (en banc) ("There is no burden upon the district court to distill every potential argument . . . on summary judgment. Rather, the onus is upon the parties to formulate arguments . . . ." (internal citation omitted)).

AO 72A
(Rev. 8/82)

### a. Smallwood establishes his prima facie case.

Smallwood establishes a prima facie discrimination case. He must prove that he: 1) belonged to a racial minority; 2) was subjected to an adverse job action; 3) was treated less favorably than non-minority employees; and 4) was qualified for his job. Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Elements one and four are uncontested. Dkt. No. 65-2 at 9. Genuine factual issues remain as to whether Smallwood "suffered an adverse employment action" and "employment . . . policies were differently applied to [him]." Ch. 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1255 (11th Cir. 2012).

Smallwood testified that he was paid less than white employees, his hours were reduced without pay, and he was fired. Dkt. No. 71-2 at 74:14-75:2, 79:17-24, 82:4-18; see also Dkt. No. 71-3 ¶ 11 (sworn declaration). This creates genuine factual issues as to whether he suffered adverse employment action. See Cotton v. Cracker Barrel Old Country Store, 434 F.3d 1227, 1231 (11th Cir. 2006) ("A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a[n] . . . employment action."); Mealing v. Ga. Dep't of Juvenile Justice, No. CV 110-123, 2013 WL 12095273, at *6 (S.D. Ga. Mar. 25, 2013) (noting termination is adverse action); cf. Amos v. Tyson Foods, Inc., 153 F.

AO 72A
(Rev. 8/82)

App'x 637, 645 (11th Cir. 2005) (per curiam) (unpublished opinion) ("Discriminatory alterations of financial benefits may qualify as adverse employment actions.").

Smallwood's evidence also creates genuine issues of material fact as to whether employment policies were applied differently to him than to white employees.[8] All that he needs is "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011) (citation omitted). He has one. According to his evidence, Defendants infused their language with racial epithets; barred black employees from whites-only bathrooms, chairs, office space, and a refrigerator; fired Sheila after calling her an "uppity nigger"; and lied to black employees as to why their hours were cut, so as to award these to white relief workers. See discussion supra. Smallwood's evidence easily establishes his prima facie case's fourth element.

### b. Defendants may offer a non-racist reason.

Defendants must now justify their actions in a non-discriminatory way. Their burden is "exceedingly light," with "no credibility assessment." Furcron v. Mail Ctrs. Plus, LLC, No. 15-14595, 2016 WL 7321211, at *12 (11th Cir. Dec. 16,

---

[8] It does not matter that he has not identified a white comparator, because "a plaintiff may use non-comparison circumstantial evidence to raise a reasonable inference of intentional discrimination and thereby create a triable issue." Gate Gourmet, Inc., 683 F.3d at 1256 (citation omitted).

AO 72A
(Rev. 8/82)

2016) (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993); <u>Smith v. Horner</u>, 839 F.2d 1530, 1537 (11th Cir. 1988)). Defendants claim that they cut Smallwood's hours and terminated him because production was seasonally down and he was an at-will employee. Dkt. No. 65-2 at 14. The Court will assume, without deciding, that this satisfies their burden.[9]

### c. Smallwood creates a genuine issue of material fact as to pretext.

Smallwood still prevails, because he has affirmative evidence that Defendants' asserted reason is a mere pretext for discrimination. Smallwood's evidence shows that Defendants used a tremendous amount of racial slurs; called his wife an "uppity nigger" right before firing her; racially segregated their bathrooms, chairs, office, and refrigerator; and handed black employees' hours over to white relief workers after lying about financial pressures. <u>See</u> discussion <u>supra</u>. This creates a genuine factual issue as to whether Defendants' stated reason for cutting Smallwood's work is pretext. <u>See</u> <u>Ross v. Rhodes Furniture, Inc.</u>, 146 F.3d 1286, 1291-92 (11th Cir. 1998) (holding jury could find pretext given differential employee discipline and decision-makers' two racially charged comments); <u>Asmo v. Keane, Inc.</u>, 471 F.3d 588, 595 (6th Cir.

---

[9] Defendants do not explain why Smallwood was paid less than white employees, instead claiming that he was not. Dkt. No. 65-1 ¶ 10. This is plainly a genuine issue of material fact.

21

2006) (holding "discriminatory atmosphere at the defendant's workplace" can show pretext (citation omitted)).

The question for now is not whether these allegations are true. Nor is it whether, if they are, Defendants could place them in a nondiscriminatory context. It is only whether a rational juror could infer discriminatory intent behind employment actions adverse to Smallwood. One could only decide otherwise by finding facts and weighing credibility. This takes this case outside the scope of the Court's responsibility, so summary judgment as to Smallwood's discrimination and disparate treatment claims must be **DENIED**.

**ii. Issues remain as to the hostile workplace claim.**

Summary judgment must also be denied as to his hostile workplace claim. Title VII bans "requiring people to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). "[T]he very fact that . . . discriminatory conduct [i]s so severe or pervasive that it created a work environment abusive to employees because of their race . . . offends Title VII[ ] . . . ." Id. at 22. A plaintiff must prove five elements:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic . . ., such as [race]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive

working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002). It is undisputed that Smallwood belongs to a protected group, as he is African-American. Genuine issues of material fact remain as to the other elements.[10]

To recall, Smallwood presented evidence that Defendants routinely made black employees clean eggs for white ones; used invidious racial epithets constantly, including Dale's regularly calling Smallwood a "coon"; and perpetually banned all black employees from using bathrooms, chairs, the office, and a refrigerator. See discussion supra. Looking at the totality of these circumstances, a reasonable juror could find this activity to be frequent, severe, humiliating, and unreasonably interfering with work duties enough to render the workplace racially hostile. Dar Dar v. Associated Outdoor Club, Inc., 201 F. App'x 718, 721 (11th Cir. 2006); see also Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010) (en banc) (unanimous opinion) ("[A] plaintiff can prove a hostile work environment by showing severe or pervasive discrimination directed against [his] protected group, even if [ ]he h[im]self is not individually singled out . . . ."); Webb v. Worldwide Flight Serv., Inc., 407 F.3d

---

[10] As to the last element, see n.5 supra. As Defendants each allegedly did wrong, the Court need not parse vicarious and direct liability.

23

1192, 1193 (11th Cir. 2005) (affirming hostile workplace finding where manager called plaintiff "nigger," "monkey," and "from the tribe" routinely over two years); EEOC v. Beverage Canners, Inc., 897 F.2d 1067, 1068 (11th Cir. 1990) (holding hostile workplace is "deplorable atmosphere of open, hostile, and racially motivated discrimination," and finding one based on coworkers' and manager's constant racially hostile remarks made "in the presence of and about black employees.").

Thus, the merits of Smallwood's hostile workplace claim can only be determined by finding facts and weighing credibility. This is the jury's domain, so summary judgment as to this claim must be **DENIED**.[11]

## II. SMALLWOOD'S RETALIATION CLAIM SURVIVES.

The same is true for Smallwood's retaliation claim. Title VII prohibits retaliation against employees for (1) making EEOC charges, (2) opposing workplace racial discrimination, or (3) filing discrimination lawsuits. 42 U.S.C. § 2000e-3(a); Simpson v. Ala. Dep't of Human Res., 501 F. App'x 951, 954 (11th Cir. 2012) (per curiam) (unpublished opinion). Determining retaliatory intent is very similar to determining discriminatory intent. The plaintiff can rely on

---

[11] Defendants contend that Smallwood's claim for compensatory emotional distress damages is insufficiently supported as to causation and harm. Dkt. No. 79 at 31. "[C]ompensatory damages[ ] . . . are determined by the jury . . . ." Warren v. Cty. Comm'n of Lawrence Cty., 826 F. Supp. 2d 1299, 1309 (N.D. Ala. 2011). Defendants can make any objections they have based on the sufficiency of the evidence following trial.

AO 72A
(Rev. 8/82)

direct or circumstantial evidence. <u>Schoenfeld v. Babbitt</u>, 168 F.3d 1257, 1266 (11th Cir. 1999). As with his discrimination claims, Smallwood's circumstantial evidence, filtered through the <u>McDonnell Douglas</u> framework, creates genuine factual issues sufficient to defeat summary judgment.

### A. Smallwood Establishes a Prima Facie Case.

Smallwood sets forth adequate evidence as to his prima facie case's elements: "(1) [ ]he engaged in protected activity under Title VII; (2) [ ]he suffered a materially adverse action; and (3) there was a causal connection between the two events." <u>McCaslin v. Birmingham Museum of Art</u>, 384 F. App'x 871, 875 (11th Cir. 2010). Title VII protects making EEOC charges, opposing workplace racial discrimination, and filing discrimination lawsuits. 42 U.S.C. § 2000e-3(a). Thus, Smallwood's December 2013 EEOC charge and October 28, 2014 lawsuit are protected. So is his August 2014 grievance, because it alleged racial discrimination. <u>See</u> <u>Bailey v. City of Huntsville</u>, 517 F. App'x 857, 861 (11th Cir. 2013) (per curiam) (unpublished opinion). The first element is met.

Smallwood has also brought forth evidence that he suffered materially adverse actions. He says that his hours were cut without compensation, and he was fired. Dkt. No. 6 ¶¶ 72-85; Dkt. No. 71-2 at 32-34; Dkt. No. 71-3 ¶ 11. This is enough. <u>Entrekin v. City of Panama City</u>, 376 F. App'x 987,

995 (11th Cir. 2010) (per curiam) (unpublished opinion) (holding termination materially adverse); cf. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 73 (2006) (holding liability attaches when reasonable employee might be made to choose between discrimination complaint and job or pay); Cotton v. Cracker Barrel Old Country Store, Inc., 434 F.3d 1227, 1231 (11th Cir. 2006) (holding, for purposes of discrimination case: "A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action.").

Finally, there are genuine issues of material fact as to whether Smallwood's protected activities caused the materially adverse actions that he claims Defendants took against him. Smallwood only has to show that his activities and Defendants' actions "were not wholly unrelated." Clover v. Total Sys. Servs., Inc., 176 F.3d 1346, 1354 (11th Cir. 1999) (quoting Simmons v. Camden Cty. Bd. of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985)). It is enough that a decision-making defendant knew of his protected activity and took action within a reasonable amount of time thereafter. Id. Smallwood shows this by testifying that Dale threatened to fire him upon receiving EEOC papers, immediately suspended him without pay for a week, and cut the number of days that he could work without compensating him. Dkt. No. 71-2 at 44:22-23, 74:14-

AO 72A
(Rev. 8/82)

75:2, 76:7-77:22, 79:17-80:24, 82:4-18. Similarly, Smallwood's termination happened within a month of his filing this discrimination lawsuit. This "close temporal proximity is sufficient to show causation." Stone v. Geico Gen. Ins. Co., 279 F. App'x 821, 824 (11th Cir. 2008) (per curiam) (unpublished opinion) (considering termination the month after the defendant learned of the plaintiff's protected activity). Even beyond temporal proximity, Smallwood allegedly recorded Dale saying, "Why you doin' yours? If you want your job, you're goin' to do what I [unintelligible]. . . . I don't get why you doin' this, if you want your job. Explain that to me." Dkt. No. 71, Ex. 10. Combined with the termination timeline, Dale's immediate retaliations, his ongoing attempts to convince Smallwood to drop his charge, and Smallwood's repeated internal complaints, this evidence creates a genuine issue of material fact as to causation. Dkt. No. 71-2 at 52:3-7; Dkt. No. 71-3 ¶ 11. Smallwood has adequately supported his prima facie case.

### B. Defendants May Offer a Non-Retaliatory Reason.

Defendants' now bear the "exceedingly light" burden of proving that they acted for a non-retaliatory reason, and the Court's analysis here "involve[s] no credibility assessment." Furcron v. Mail Ctrs. Plus, LLC, No. 15-14595, 2016 WL 7321211, at *12 (11th Cir. Dec. 16, 2016) (quoting St. Mary's

27

Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993); Smith v. Horner, 839 F.2d 1530, 1537 (11th Cir. 1988)). Defendants claim that they cut Smallwood's hours and let him go because production was down outside of peak season and he was employed at-will. Dkt. No. 65-2 at 14. The Court will again assume, without deciding, that this satisfies their burden.

**C. Smallwood Creates a Genuine Fact Issue as to Pretext.**

Smallwood survives summary judgment anyway, because he "has cast sufficient doubt on [Defendants'] proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that [these] were not what actually motivated [their] conduct." Crawford v. Carroll, 529 F.3d 961, 976 (11th Cir. 2008) (quoting Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997)). Recordings allegedly capture Dale saying, with reference to Smallwood's EEOC charge, "Why you doin' yours? If you want your job, you're goin' to do what I [unintelligible]. . . . I don't get why you doin' this, if you want your job. Explain that to me." Dkt. No. 71, Ex. 10; cf. id., Ex. 11 ("I'm a son of a bitch . . . I don't fuck with you . . . Goddamn [unintelligible] those papers. . . . When you've done those papers, you done fucked with me . . . .").

This evidence makes this the sort of case "where the plaintiff's initial evidence, combined with effective cross-examination of the defendant[s], [could] suffice to discredit

28

[their] explanation" and thus convince a rational juror that it is mere pretext. <u>Tex. Dep't of Community Affairs v. Burdine</u>, 450 U.S. 248, 255 n.10 (1981). Therefore, summary judgment as to Smallwood's retaliation claim is **DENIED**.

### CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, dkt. no. 65, is **DENIED**. It is, however, **GRANTED** as to Smallwood's Title VII claims against Alpine and Dinwiddie.

**SO ORDERED**, this 13th day of January, 2017.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)